**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TINA HAYEST,** | ) | **CASE NO.  1:06 CV 0020** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **vs.** | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| **THE CLEVELAND CLINIC** | ) | **AND ORDER** |
| **FOUNDATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Before the Court is Defendant's Motion for Summary Judgment ("Motion").  (**ECF No. 16**.)  For the following reasons, the Motion is **GRANTED** and the claim is dismissed with prejudice.

## I.  BACKGROUND

In December 2005, Plaintiff Tina Hayest ("Hayest") filed a state-court complaint against Defendant The Cleveland Clinic Foundation ("CCF"), alleging violations of the Ohio Civil Rights Act, O.R.C. § 4112, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Ohio public policy related to her termination from employment with CCF.[1]  (*ECF*

---

[1] The complaint alleges a violation of O.R.C. § 4412 "protecting persons in the workplace with disabilities and handicaps" and "Title 42 United States Code, Chapter 126 Equal

*No. 1, Ex. A* ¶¶ 1-3.)  The complaint alleges CCF failed to provide Hayest with reasonable

accommodations, and unlawfully discharged her because of her disability.  (*Id.* ¶¶ 7-8.)  After

removing the case to this Court, CCF filed a motion to dismiss the public policy claim pursuant

to Federal Rule of Civil Procedure 12(b)(6) on the grounds that O.R.C. § 4112 already provides

Hayest with complete relief.  (*ECF No. 10.*)  The Court subsequently granted the motion to

dismiss the public policy claim, and dismissed the public policy claim with prejudice.  (*ECF No.

13*.)  After the conclusion of discovery, CCF filed the instant Motion, brief in support of the

Motion, and accompanying exhibits on August 8, 2006.  (*ECF No. 16* (modified by substituting

sworn affidavits for unsworn declarations on October 11, 2006, *ECF No. 23*).)  On September 5,

2006, Hayest filed a brief in opposition to CCF's Motion, with no accompanying exhibits,

deposition transcripts or affidavits whatsoever.  (*ECF Nos. 17, 18.*)  Accordingly, CCF filed a

reply to Hayest's opposition brief on September 21, 2006.  (*ECF No. 21.*)  Finally, Hayest filed

an affidavit in response to CCF's sworn affidavits on October 13, 2006.  (*ECF No. 27.*)

Therefore, the Motion has been fully briefed and is now ripe for adjudication.

## II. LEGAL STANDARDS

### A.    Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  All facts and inferences drawn therefrom must be viewed in a

---

Opportunities for individuals with disabilities."  (*Compl.* ¶¶ 1-2.)  The Court assumes that these
claims are actually being brought under O.R.C. § 4112 (Ohio's anti-discrimination statute) and 42
U.S.C. § 12101 (Americans with Disabilities Act).

light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law.  *See Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989)).  To meet this burden, the party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the nonmoving party's failure to produce any evidence which would create a genuine dispute for the jury.  *See Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d at 1477).  Entry of summary judgment in favor of the defendant is appropriate if the plaintiff fails to show evidence sufficient to establish an essential element of the plaintiff's case on which he or she will bear the burden of proof at trial.  *See Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the defendant satisfies its burden, then the burden of going forward shifts to the plaintiff to produce evidence that results in a conflict of material fact to be resolved by a jury.  *See Cox*, 53 F.3d at 148.  A scintilla of evidence in support of the plaintiff's position is not enough.  *See Employers Ins. Of Wausau v. Petroleum Specialities, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  There must be evidence from which a reasonable jury could find for the plaintiff.  *Id.*  If the evidence is insufficient to reasonably support a verdict in

favor of the plaintiff, the defendant's motion for summary judgment must be granted.  *Cox*, 53 F.3d at 150.

>    **B.**    **Disability Discrimination**

A disability discrimination claimant must show direct or indirect evidence of discrimination based on his or her disability.  *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).  If the claimant cannot show direct evidence, her or she must establish a prima facie case by establishing that (1) he or she is disabled; (2) he or she is otherwise qualified for the position, with or without reasonable accommodation; (3) he or she suffered an adverse employment decision; (4) his or her employer knew or had reason to know of his or her disability; and (5) his or her position remained open, or he or she was replaced.[2] *Brenneman v. MedCentral Health System*, 366 F.3d 412, 417 (6th Cir. 2004) (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999)).  If the claimant establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination.  *Id.* (citing *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520-21 (6th Cir. 1998)).  Once the defendant establishes a legitimate, non-discriminatory reason, the claimant must demonstrate that the proffered reason was merely a pretext for unlawful disability discrimination.  *Id.*

The existence of a disability is determined on a fact-specific, case-by-case basis.  *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002); *Sutton v. United Air Lines,*

---

[2] The Court notes that although Hayest makes claims under both the federal ADA and Ohio disability law found in O.R.C. § 4112, Sixth Circuit and Ohio case law reveal that both claims are generally subject to the legal analysis applicable to ADA claims.  *See Brenneman*, 366 F.3d at 418 (citing *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n.2 (6th Cir. 2000) (holding that "both federal and Ohio discrimination actions require the same analysis")).

*Inc.*, 527 U.S. 471, 483 (1999) ("Whether a person has a disability under the ADA is an individualized inquiry").  Under the ADA, the term "disability" means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment."[3]  42 U.S.C. § 12102(2).  Hayest fails to identify under which of these three prongs she brings the instant claims, and thus the Court addresses the requirements for all three.

Initially, for prong (A), a claimant must prove he or she has a physical or mental impairment which limits a major life activity, and that limitation must be substantial.  *See Williams*, 534 U.S. at 195-96 (citing 42 U.S.C. § 12102(2)(A)).  A physical or mental impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA.  *See Dunaway v. Ford Motor Co.*, 134 Fed. Appx. 872, 877 (6th Cir. 2005) (citing *Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002)).

---

[3] Similarly, O.R.C. § 4112.01(A)(13) defines disability as a "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of physical or mental impairment; or being regarded as having a physical or mental impairment."

The Court notes the recent opinion in *Johnson v. Metrohealth Med. Ctr.*, 2004 Ohio 2864, *P7-*P23 (Ohio App. 8 Dist. June 3, 2004), which creates a question of whether Ohio § 4112.01(A)(13) is a less stringent standard than the analogous 42 U.S.C. § 12102(2) definition of disabled.  *See also, Fink v. Ohio Health Corp.*, 2004 U.S. Dist. LEXIS 28567, *24 n.6 (Aug. 26, 2004) ("The Court notes that a recent decision by the Eighth District Court of Appeals calls this premise [that the required showings to establish a "disability" under the ADA and O.R.C. § 4112 are identical] into question") (citing *Johnson*)).   The Court also notes, however, that the *Johnson* opinion is a singular instance, which other courts have declined to follow.  *See, e.g.*, *Vickers v. Wren Industries*, 2005 Ohio 3656, *P34 (Ohio App. 2nd Dist. 2005) (in light of *Johnson*, the court was still "unpersuaded that precedence does not allow [courts] to look to federal law for guidance in whether [a claimant] was disabled").

Thus, unless and until the Ohio Supreme Court interprets Ohio's statute otherwise, the Court applies the federal ADA analysis to Ohio § 4112 claims, which includes the definition of "disabled" found in 42 U.S.C. § 12102(2).

Similarly, for prong (B), a record of a substantial limitation on a major life activity means an individual has a "history of . . . a mental or physical impairment that substantially limits one or more major life activities."  *MX Group, Inc. V. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (quoting 28 C.F.R. § 35.104(3)).  *See also Shepler v. Northwest Ohio Development Ctr*, 2000 U.S. App. LEXIS 1954, *15-16 (6th Cir. 2000) (citing 29 C.F.R. § 1630.2(k)).  Thus, the impairment indicated in the record must be one that substantially limits a major life activity. *Shepler*, 2000 U.S. App. at *15.  Additionally, the "record of impairment" standard is only satisfied if the claimant actually suffered a physical impairment that substantially limited one or more of the claimant's major life activities.  *See Greathouse v. Westfall*, 2006 U.S. Dist. LEXIS 916, *12-13 (W.D. Kent. 2006) (citing *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999)).

Finally, as to prong (C), a claimant may show he or she is "regarded as having" a disability in one of two separate ways, either of which requires that the defendant "entertained misconceptions" about the claimant.  *Sutton*, 527 U.S. at 489.  First, the claimant may show the defendant mistakenly believed the claimant had a physical or mental impairment that substantially limited him or her in a major life activity when, in fact, the claimant did not have an impairment.  *See id.*  Second, the claimant may instead show the defendant mistakenly believed a claimant's actual impairments substantially limited one or more major life activities when in fact the impairment did not so limit the claimant.  *See id.*

Significantly, under any of these three prongs, the claimant must identify the major life activity substantially limited by his or her alleged disabilities.  *See, e.g.*, *Williams*, 534 U.S. at 195 ("Claimants . . . need to demonstrate that the impairment limits a major life activity").

-6-

When "working" is the major life activity in question, a plaintiff must demonstrate, at the minimum, that he or she is "unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491.[4] Furthermore, the EEOC applies a unique definition of the term "substantially limits" regarding the major life activity of working: "substantially restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Id.* at 491-92 (quoting 29 CFR § 1630.2(j)(3)(i)). Thus, to be "substantially limited" in the major life activity of "working," a claimant must be "precluded from more than one type of job, a specialized job, or a particular job of choice." *See id.* at 492. Accordingly, if jobs using a claimant's skills are available to him or her, the claimant is not precluded from a "substantial class of jobs," even if those available jobs do not necessarily use the claimant's unique talents. *See id.* Similarly, if "a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Id.*

### III. FACTS

The facts in the light most favorable to Hayest are as follows.

### A. CCF Policies and Procedures

CCF's Employee Handbook includes the company's Rules of Conduct, Corrective Action Policy, Attendance Policy, and Right of Review Policy. (Hayest Dep.[5] 164-70; Hayest Dep. Ex. 9-11.) CCF enforces their rules, policies, and procedures via the Corrective Action Policy,

---

[4] Although the Supreme Court has not definitively answered the question of whether "working" qualifies as a major life activity, the Sixth Circuit has recognized "working" to be a major life activity. *See McElroy v. Philips Med. Syst. North Am., Inc.*, 127 Fed. Appx. 161, 168 n.3 (6th Cir. 2005) (citing *Williams*, 534 U.S. at 200; *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002)); *Dunaway v. Ford Motor Co.*, 134 Fed. Appx. 872, 879 (citing *Mahon*, 295 F.3d, at 590).

[5] Deposition Transcripts of Plaintiff Tina Hayest, Exhibit 1 to Defendant's Support Brief, May 19, 2006, June 9, 2006, & June 20, 2006. *ECF No. 16.*

which applies to all employees who fail to abide by these established rules, policies, and procedures.  (Cherry Aff.[6] ¶ 7; Cherry Aff. Ex. 3.)  The four steps of the Corrective Action Policy are: Step 1: Documented Counseling; Step 2: Written Warning; Step 3: Suspension; and Step 4: Termination.  (Hayest Dep. Ex. 11, 20; Cherry Aff. Ex. 3.)  Additionally, CCF uses "Employee Anecdotal Notes" ("Anecdotal"), written documentation of instances when an employee has been counseled about a particular issue or behavior.  (Cherry Aff. ¶ 7; Hayest Dep. 221.)  These Anecdotals are not considered formal discipline, but are included in an employee's departmental file.  (Cherry Aff. ¶ 7.)  Corrective Actions are included in both the employee's departmental file and human resources personnel file.  (Cherry Aff. ¶ 7.)  The Employee Handbook lists the following actions as among the (non-exclusive) examples of Rules of Conduct violations; using profane or unprofessional language, returning late from rest breaks or meal periods, engaging in unauthorized absence from the work area, and engaging in unacceptable job performance.  (Hayest Dep. Ex. 11,  20-23; Cherry Aff. Ex. 3.)

CCF uses a "no-fault" Attendance Policy, under which there are no "excused" or "unexcused" absences.  (Hayest Dep. 168-69; Hayest Dep. Ex. 11; Cherry Aff. ¶ 6.)  Instead, employees receive attendance points for absences not classified as Family and Medical Leave Act ("FMLA") absences, regardless of the reason for the absence.[7]  (Hayest Dep. Ex. 11; Cherry Aff. Ex. 2, 3.)  An employee receives Progressive Corrective Action when and if an employee exceeds the maximum allowable points in a given time period.  (Hayest Dep. 169; Hayest Dep.

---

[6] The Affidavit of Beth Cherry, Administrator for CCF's Strongsville and Brunswick facilities, October 9, 2006, Exhibit 2 to Defendant's Motion for Summary Judgment.  *ECF No. 16*.

[7]Employees absent pursuant to FMLA are not assessed points for those FMLA absences. (Cherry Aff. 4; Hayest Dep. 142, 168-69.)

Ex. 11.)  The threshold for triggering Progressive Corrective Action is based on the number of shifts an employee works per week.  (Hayest Dep. 169; Hayest Dep. Ex. 11.)  Hayest worked a forty-hour workweek.  (Hayest Dep. 169.)  Accordingly, Hayest would receive Progressive Corrective Action upon accumulating 16 points if the previous corrective action was at least six months but less than one year previously, or upon accumulating 8 points if her most recent progressive corrective action was less than six months prior.  (*See* Cherry Aff. Ex. 2, 3-4.)

CCF's Right of Review Policy essentially allows employees to appeal any disciplinary actions with which the employee disagrees.  (Hayest Dep. 169-70; Hayest Dep. Ex. 11, 25; Cherry Aff. ¶ 8; Cherry Aff. Ex. 4.)  Crucially, the right of review process also allows CCF employees to initiate complaints of any alleged discrimination suffered by the employee. (Hayest Dep. 169-70; Hayest Dep. Ex. 11, 25; Cherry Aff. ¶ 8; Cherry Aff. Ex. 4.)

### B.  Hayest's Employment With CCF

Hayest began her employment with CCF on April 14, 2003, as a Patient Services Representative ("PSR") at CCF's Brunswick facility.  (Hayest Dep. 163-64; Hayest Dep. Ex. 9.) At the time Hayest was hired, she attended new employee orientation and received training on CCF departmental policies and procedures.  (Hayest Dep. 164; Hayest Dep. Ex. 9.)  Hayest also received a copy of CCF's Employee Handbook and became familiar with its contents, including the previously listed rules, policies, and procedures.  (Hayest Dep. 164-70.)  Hayest's PSR job included scheduling patient appointments, validating patient insurance coverage to ensure accurate billing, and conducting other related clerical duties.  (Hayest Dep. 43-44; Hayest Dep. Ex. 41.)  The PSRs rotated between the following work assignments; (1) the telephone room (scheduling appointments and conducting patient registration), (2) the check-in desk (checking

in patients as they arrive for appointments), and (3) the check-out desk (checking out patients and scheduling follow-up appointments as necessary).  (Hayest Dep. 88, 170-71.)

At the end of May 2003, CCF produced a 45-day Performance Evaluation of Hayest's performance to that point.[8]  (Hayest Dep. 187-88; Hayest Dep. Ex. 13.)  On that Performance Evaluation, Hayest generally received AA marks for applicable categories, although she received an IE rating for the "Manages time effectively" category.  (Hayest Dep. 187-88; Hayest Dep. Ex. 13.)  The "Overall Performance Summary" section indicates that Hayest met expectations at that time.  (Hayest Dep. 187-88; Hayest Dep. Ex. 13.)  Additionally, Hayest received positive verbal comments from her supervisor about her performance to that point.  (Hayest Dep. 191-92.)

In June 2003, shortly after her initial 45-day Performance Evaluation, Hayest took an unpaid medical leave of absence for the first of what would be two hip-related surgeries.[9]  (Hayest Dep. 59, 156).  Hayest suffers from avascular necrosis, and as a result initially required full hip replacement surgery.  (Hayest Dep. 59.)  Hayest underwent left hip replacement surgery on June 19, 2003.  (Hayest Dep. 108; Hayest Dep. Ex. 5.)  Hayest was still a new hire on CCF's standard 90-day probationary period at the time of the first hip surgery.  (Hayest Dep. 88.)  Hayest was on unpaid leave for a two week period following the initial hip replacement surgery.  (Hayest Dep. 87.)  Anxious to complete her 90-day probationary period and to earn a paycheck

---

[8] CCF employees are rated in myriad categories of actions, receiving marks as to the frequency the employee engaged in the described actions.  The possible choices are (from best to worst): Exceptional Performance ("EP"); Always or Almost Always ("AA"); Inconsistent or Erratic ("IE"); Seldom or Never ("SN").

[9] Pursuant to CCF policy and federal law, Hayest was not eligible for FMLA leave for her initial hip surgery, because she had not been a CCF employee for the requisite twelve months.

again, Hayest, in her own words, "begged" and "pushed" her doctor for clearance to return to work.  (Hayest Dep. 45, 88.)

Upon Hayest's return to CCF, she was on crutches for six to eight weeks to reduce pressure on her reconstructed hip.  (Hayest Dep. 88.)  Consequently, her immediate supervisor arranged Hayest's work schedule and duties such that Hayest was only responsible for the phones work station, where she could remain seated, instead of rotating between the three PSR work stations as per the normal office procedures.  (Hayest Dep. 88.)

Hayest remained on the phones for approximately four weeks, at which point she transitioned to a single crutch.  (Hayest Dep. 89.)  Around that time, Hayest grew "tired of being on the phones," and informed her supervisor that Hayest wanted to work check-out instead. (Hayest Dep. 89.)  CCF scheduled Hayest accordingly, and the new arrangement was satisfactory to Hayest.  (Hayest Dep. 89-90.)  According to Hayest, no other accommodations were needed at that time, nor did she ever request any accommodations.  (Hayest Dep. 89-90.)

Shortly after the hip surgery, Hayest sought treatment at Lutheran Hospital for nausea and vomiting on July 31, 2003.  (Hayest Dep. 105-08; Hayest Dep. Ex. 5.)  She was discharged on August 2, 2003.  (Hayest Dep. 105-08.)  Over the duration of her employment with CCF, Hayest was in and out of the hospital (and absent from work) for similar symptoms, which she refers to as her "stomach issues."  (Hayest Dep. 142-44.)  Similarly, Hayest also sought treatment for "stress and anxiety" from various medical providers over approximately six months in 2004.  (Hayest Dep. 146-48.)  Pursuant to CCF's no-fault Attendance Policy, Hayest accumulated attendance points when absent from work because of her stomach issues and stress and anxiety.  (Hayest Dep. 139-41.)

Returning to work two weeks after the hip surgery, Hayest continued to have problems complying with CCF policies, rules, and procedures.  By the time of her 90-Day Review on August 26, 2003, Hayest had already compiled two Anecdotals,[10] 15 attendance points, and a Documented Counseling[11] about her unprofessional behavior.[12]  The Documented Counseling, issued on August 8, 2003, was Step 1 on the Progressive Corrective Action continuum.  (Hayest Dep. 244-45; Hayest Dep. Ex. 39.)  The Documented Counseling warned Hayest about several areas of concern, including: (1) giving advice to a patient regarding medicine; (2) failing to appropriately transfer calls to the triage nurse; (3) having inappropriate conversations about patients in an open area; and (4) speaking in a vulgar manner and using inappropriate words and gestures towards co-workers.  (Hayest Dep. 244-45; Hayest Dep. Ex. 39.)

Hayest's 90-Day Review, was markedly less favorable than the previous 45-Day Evaluation and revealed serious concerns about Hayest's performance to that point.  (Hayest Dep. Ex. 14.)  Using the same possible rating categories as the 45-day Evaluation, Hayest

---

[10] July 25, 2003: received Anecdotal, counseled on concerns regarding the need to maintain patient confidentiality, and instructed to refrain from discussing patients' confidential medical matters with other PSRs.  (Hayest Dep. 222-23; Hayest Dep. Ex. 18.)
August 25, 2003: received Anecdotal, documented inappropriate behavior including unprofessional outbursts of anger towards her co-workers, improperly scheduling a patient medical procedure, and forgetting to lock the front desk when she was the last person to leave the office on a particular occasion.  (Hayest Dep. 223-24; Hayest Dep. Ex. 19.)

[11] The concerns about Hayest's behavior and treatment of co-workers were precipitated in part by written complaints to Hayest's supervisor, Beth Cherry, from some of Hayest's co-workers. (Cherry Aff. ¶ 9; Cherry Aff. Ex. 5.)  Both letters expressed concerns based on the respective writer's observations of Hayest's professionalism, language, and behavior in the office.  (Cherry Aff. ¶ 9; Cherry Aff. Ex. 5.)

[12] Hayest was also informally admonished, on the very same day as her 90-Day Performance Review, for improperly scheduling a patient for an inappropriately short appointment block given the patient's numerous medical problems.  (Hayest Dep. 225; Hayest Dep. Ex. 20.)

received SN ratings in four categories,[13] IE ratings in five categories,[14] and IE ratings in two

additional Technical Excellence subcategories.[15]  (Hayest Dep. Ex. 14.)  The Comments section

of the review document includes written acknowledgment of documented counseling and

Anecdotals for unprofessional behavior and job performance.  (Hayest Dep. Ex. 14.)  Hayest

received an Overall Rating of "Needs Improvement."  (Hayest Dep. 192, 203-04; Hayest Dep.

Ex. 14, 1-2.)

Within a few weeks of the 90-Day Review, Hayest had accumulated 21 attendance points

for the period between July 29, 2003 and September 12, 2003, enough points to merit her first

Written Warning (Step 2 in the Progressive Corrective Action policy).  (Hayest Dep. 259-60;

Hayest Dep. Ex. 42.)  CCF issued the Written Warning to Hayest on September 12, 2003.[16]

_____

[13] The four SN ratings were in the following categories:  "Uses appropriate conversation in
presence of customer"; "Interacts with personnel in a supportive, respectful manner"; "Works well
as a team member and individual"; and "Communicates effectively verbally and written."  (Hayest
Dep. Ex. 14, 1.)

[14] The five IE ratings were in the following categories: "Greets others with a pleasant
demeanor, acknowledges the presence of others"; "Acknowledges and respects individual and
cultural differences"; "Responds to change in a positive manner"; "Accepts constructive criticism
without defensive responses and changes behavior appropriately"; and "Produces quality
outcomes."  (Hayest Dep. Ex. 14, 1.)

[15] The two IE ratings were in the following Technical Excellence subcategories: "Follows
appointment scheduling and departure protocols (EPIC)"; Ensures all compliance requirements are
met in the department (Patient [unintelligible] and appointment guidelines and point of service
including copayment collection)".  (Hayest Dep. Ex. 15, 1 (the Court assumes the definitions
provided in Hayest Dep. Ex. 15 are standard definitions applicable to CCF's formal reviews,
whether of the 45-day, 90-day, or annual variety).)

[16] Hayest's attendance points were accumulated as follows:
•     July 29, 2003; July 30, 2003; July 31, 2003 (Unscheduled Paid Time Off
    ("UPTO"), 1 point per instance, 3 points total);
•     August 1, 2003 (No call, no show, 5 points);
•     August 4, 2003 (Left early, 1 point);
•     August 11, 2003; August 12, 2003; August 14, 2003; August 23, 2003; August 25,
    2003; August 26, 2003; August 29, 2003; September 3, 2003; September 4, 2003;

(Hayest Dep. 259-60; Hayest Dep. Ex. 42.)  Thus, in less than six months of employment with

CCF, Hayest had already advanced to the second step on CCF's Progressive Corrective Action

policy.  By the end of 2003, Hayest had accumulated eight Anecdotals[17] to go along with her

official disciplinary record.[18]

---

- September 8, 2003; September 10, 2003 (Tardy, 1 point per instance, 12 points
  total).

(Hayest Dep. Ex. 42.)

It should also be noted that although Hayest testified in her deposition that a particular
batch of tardies was due to a misunderstanding of the procedures for "swiping" in on the time
clock, (Hayest Dep. 189), those tardies appear to have occurred before Hayest's 45-Day review
(Hayest Dep. 189).  Accordingly, the tardies reflected on the various Progressive Corrective Action
documents are entirely different instances, and are uncontested.  Furthermore, Hayest admits she
did not appeal the assessment of the attendance points as was her right under the Right of Review
policy.  (Hayest Dep. 263.)

[17] Hayest's 2003 Anecdotals are as follows:
- July 25, 2003, *supra* n10;
- August 25, 2003, *supra* n10;
- August 29, 2003: received Anecdotal for twice improperly inserting personal
  messages to other CCF staff members in patient care charts.  (Hayest Dep. 228-29;
  Hayest Dep. Ex. 22);
- September 4, 2003: received Anecdotal for scheduling two different patients with
  multiple health problems for 15-minute appointments instead of the proper 30-
  minute appointments, despite previous admonishment for same issue on August
  26, 2003 (Hayest Dep. 229-30, Hayest Dep. Ex. 23);
- October 9, 2003: received Anecdotal for leaving the office to attend to a non-job
  related matter, failed to return within the 30-minute time allotted for lunch break,
  and failed to properly swipe out when leaving as required by the established
  procedures (Hayest Dep. 230-31, Hayest Dep. Ex. 24);
- November 20, 2003: received Anecdotal for improperly ordering an incorrect test
  (Hayest Dep. 231, Hayest Dep. Ex. 25);
- December 4, 2003: received Anecdotal documenting counseling about
  unprofessional behavior, i.e. making negative remarks regarding patients
  scheduling and canceling appointments in an area where patients and co-workers
  were present (Hayest Dep. 232, Hayest Dep. Ex. 26);
- December 11, 2003: received Anecdotal documenting unprofessional behavior
  following patient's wife's complaint that Hayest was "nasty and rude"when
  canceling and rescheduling appointment (Hayest Dep. 232, Hayest Dep. Ex. 27).

[18] Hayest erroneously claims on page 4 of her opposition brief that she had no anecdotals
during the first 18 months of her employment.

-14-

On April 20, 2004, Hayest received her first Annual Performance Evaluation, which reflected three IE ratings.[19]  (Hayest Dep. 207-09, 214; Hayest Dep. Ex. 16.)  This Evaluation also documented that Hayest was a "hard worker," but that teamwork should be a focus for the coming year, and that she had received numerous Anecdotals and a Written Warning for attendance during her first year at CCF.  (Hayest Dep. 207-09, 214; Hayest Dep. Ex. 16.)

In May of 2004, X-rays revealed the initial hip replacement surgery had not been a complete success, and thus Hayest underwent hip augmentation surgery on the previously replaced hip.  (Hayest Dep. 62-63, 77-78.)  Pursuant to federal law, Hayest requested, and was granted, FMLA leave for the time off from work.  (Hayest Dep. 91, 94, 156-57.)  In June, 2004, as Hayest's return to work drew near, she suffered a further hip complication.[20]  (Hayest Dep. 77-79.)  The complication required Hayest to wear a full body brace for approximately three months, although she returned to work (before shedding the full body brace) on approximately July 16, 2004.  (Hayest Dep. 77-79.)  When she returned to work, Hayest needed to get up and move around for five minutes of every half hour due to her body brace, which she was able to do, but she did not request any accommodations at work.  (Hayest Dep. 92-93.)  In total, Hayest was absent from work for eight weeks (essentially all of May and June, 2004) pursuant to the second hip surgery and its aftermath, all of which were classified as FMLA leave and for which Hayest was not assessed attendance points.  (Hayest Dep. 91, 94, 156-57.)

---

[19] The three IE ratings were in the following categories: "Uses appropriate conversation in presence of customer"; "Greets others with a pleasant demeanor, acknowledges the presence of others"; and "Accepts constructive criticism without defensive responses and changes behavior appropriately."  (Hayest Dep. Ex. 16, 1.)

[20] Hayest testified in her deposition that "we were at [a wedding reception] and I was going across the dance floor and . . . I heard something snap."  (Hayest Dep. 78.)

By September of 2004, Hayest had accumulated another 21 attendance points during the12-month period from September 24, 2003 to September 24, 2004.[21]  (Hayest Dep. Ex. 43.) This was enough to warrant a second Written Warning, issued on September 29, 2004.  (Hayest Dep. Ex. 43.)  Then, Hayest compiled another 11 points and another 2 Anecdotals[22] between the second Written Warning and December 29, 2004.[23]  Suspension is Step 3 in CCF's Progressive Corrective Action policy, and accordingly CCF suspended Hayest for accumulating 11 more attendance points within six months of her previous Progressive Corrective Action.  (Hayest

---

[21] Hayest's attendance points were accumulated as follows:
- September 29, 2003; October 2, 2003; October 31, 2003; December 18, 2003 (Tardy, 1 point per instance, 4 points total)
- October 23, 2003 (left early, 1 point)
- October 27, 2003; April 12, 2004; May 11, 2004; August 29, 2004 (UPTO, 2 points per instance, 8 points total)
- August 2, 2004; August 31, 2004; September 1, 2004; September 24, 2004 (Absent, 2 points per instance, 8 points total).

(Hayest Dep. Ex. 43.)

[22] December 27, 2004: received Anecdotal documenting events surrounding Hayest's early departure from work on December 17, 2004 and CCF's denial of FMLA classification for that absence due to no doctor's verification paperwork.  (Hayest Dep. 233-34; Hayest Dep. Ex. 28.)

Hayest in her deposition testimony denied seeing the Anecdotal represented in Hayest Dep. Ex. 28, and charged the purported author of the Anecdotal with fabricating the contents thereof. (Hayest Dep. 233-34.)  Hayest also testified, however, that she had no personal knowledge that the document was fabricated.  (Hayest Dep. 233-34.)  Critically, she does not deny the <u>existence</u> of the document, and only offers unsubstantiated allegations attacking the <u>contents</u> of the official document.

December 29, 2004: received Anecdotal reflecting Hayest's unauthorized departure from the office without swiping out.  (Hayest Dep. 234-35; Hayest Dep. Ex. 29.)

[23] Hayest's attendance points were accumulated as follows:
- October 5, 2004; October 11, 2004 (left early, 1 point per instance, 2 points total)
- October 13, 2004 (absent/late call, 4 points)
- November 18, 2004 (left early, less than 50% of shift worked, 2 points)
- December 17, 2004 (left early, 1 point)
- December 28, 2004; December 29, 2004 (left the premises at lunch, failure to swipe, 1 point per instance, 2 points total).

(Hayest Dep. Ex. 44.)

Dep. Ex. 44.[24])  Notably, CCF explicitly warned Hayest, on the Written Warning and Suspension documents, to improve her attendance, (Hayest Dep. 161-62, 262, Hayest Dep. Ex. 42, 43, 44), and the Suspension document explicitly warned Hayest to improve attendance or face termination.  (Hayest Dep.Ex. 44.)

After returning from her suspension, Hayest garnered two more Anecdotals,[25] and an Annual Performance Evaluation showing eight IE ratings, and a failing mark for the essential job requirement entitled "Complying with policies and procedures."[26]  (Hayest Dep. 217; Hayest Dep. Ex. 17.[27])

_____

[24] CCF originally suspended Hayest from work January 4-7, 2005, but she was on FMLA medical leave during the original suspension dates.  (Hayest Dep. 161-62, 262; Hayest Dep. Ex. 7; Hayest Dep. Ex. 44.)  Therefore, CCF rescheduled the suspension to January 7-12, 2005.  (Hayest Dep. 161-62, 262; Hayest Dep. Ex. 7; Hayest Dep. Ex. 44.)

Hayest erroneously claims she was "suspended January 1, 2005 to January 12, 2005 for excessive lost time."  (Pl. Opp. Br. 5.)

[25] February 1, 2005: issued Anecdotal for leaving workstation without informing co-workers or supervisor in violation of established procedures.  (Hayest Dep. 235-36; Hayest Dep. Ex. 30.)

February 2, 2005: received Anecdotal for leaving the phones understaffed when Hayest went to lunch, and for not clearing the arrangement with supervisors beforehand as required.  (Hayest Dep. 236-37; Hayest Dep. Ex. 31.)

[26] The eight I/E ratings were in the following categories: "Uses appropriate conversation in presence of customer"; "Interacts with personnel in a supportive, respectful manner"; "Responds to change in a positive manner"; Works well as a team member and individually"; Accepts constructive criticism without defensive responses and changes behavior appropriately"; "Manages time effectively"; "Ensures the accuracy and completeness of patient insurance and billing information (registration)"; and "Complies with policies and programs within CCF and the department."  (Hayest Dep. Ex. 17.)

[27] There appears to have been two different versions of the February, 2005 Annual Performance Evaluation.  (*See* Hayest Dep. Exs. 17 & 21.)  The Court observes, however, that regardless of the "Overall Performance Summary" rating difference between the two forms, the specific category ratings are identical.  (*See* Hayest Dep. Exs. 17 & 21.)  Furthermore, CCF offers uncontested evidence establishing the second Evaluation was the proper evaluation for Hayest.  (Cherry Aff. ¶¶ 10-13.)  Hayest alleges the first Evaluation was the proper assessment, but Hayest acknowledged her supervisor informed her of the erroneously issued evaluation.  (Hayest Dep. 217-19) (stating after the original Evaluation, "a couple of days later . . . I got called back in the

-17-

In light of CCF's concern over Hayest's ongoing job performance problems, CCF put Hayest on a Performance Improvement Plan ("PIP") on April 21, 2005, after the 2005 Annual Performance Evaluation.  (Hayest Dep. 264; Hayest Dep. Ex. 45.)  The PIP explicitly spelled out the improvements Hayest needed to make to remain employed at CCF,[28] and Hayest acknowledged that she could be terminated if her performance did not improve by June 15, 2005. (Hayest Dep. 264-65; Hayest Dep. Ex. 45.)

Improvement did not occur.  Between the time the PIP was implemented and her termination on June 16 2005, Hayest acquired still another three Anecdotals[29] and received repeated counseling about professionalism, performance, and attendance issues.[30]  (Wellman

_____

afternoon [and told] 'Oh, I made a mistake.  We're going to change [the Evaluation] to Needs Improvement'").

Furthermore, Hayest's deposition testimony that she knew of two different annual reviews in February, 2005 directly contradicts paragraph one of her sworn affidavit in which Hayest disclaims any knowledge of a revised 2005 performance evaluation until filing the instant suit.  It is well-settled that "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).  *See also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (explaining "*Reid* and its progeny have . . . barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony").

[28] The Areas of Deficiency noted on the PIP were as follows: "Interacting with Personnel," "Using Appropriate Conversation," and "Attendance."  (Hayest Dep. 264-65; Hayest Dep. Ex. 45.)

[29] May 6, 2005: received Anecdotal documenting continued negative attitude and inappropriate documentation in patient charts.  (Hayest Dep. 238; Hayest Dep. Ex. 33.)

May 20, 2005: received Anecdotal, documenting another accumulated 8 attendance points, as well as improperly scheduling a Medicaid patient for services not covered by Medicaid.  (Hayest Dep. 238-39; Hayest Dep. Ex. 34.)

June 3, 2005: received Anecdotal documenting various unprofessional behaviors and unacceptable job performance, including excessive personal conversation at the front desk and breaches in scheduling protocol.  (Hayest Dep. 239-40; Hayest Dep. Ex. 35.)

[30] June 10, 2005: discussed scheduling protocol with supervisor Tammy Wellman.  (Wellman Aff. ¶ 5; Wellman Aff. Ex. 3.)

June 16, 2005: admonished for collecting full payment from patients before insurance had

-18-

Aff.[31] ¶¶ 5-7, Ex. 3,4.)  Finally, on June 16, 2005, Hayest's supervisor, Tammy Wellman, discovered Hayest had been improperly manipulating the scheduling system.[32]  (Hayest Dep. 266-67; Wellman Aff. ¶ 8; Hayest Dep. Ex. 38.)  CCF terminated Hayest at that point.  (Hayest Dep. 266-67; Wellman Aff. ¶ 8; Hayest Dep. Ex. 38.)

### C.    Hayest's Employment After Termination From CCF

After CCF terminated Hayest, she immediately sought other employment in a range of jobs roughly analogous to her former PSR position.  (Hayest Dep. 271; Hayest Dep. Ex. 46.) Hayest placed no restrictions on her job search other than trying to find a job in the greater Cleveland area.  (Hayest Dep. 271; Hayest Dep. Ex. 46.)  Although Hayest found subsequent work with at least three different employers, she stayed at each position less than two months.

On October 3, 2005, Expert System Applications, Inc. ("ESA") in Solon, Ohio hired Hayest as a medical transcriptionist.  (Ngo Aff., ¶ 3[33]; Hayest Dep. 283.)  This job required Hayest to transcribe doctors' untyped notes into a computer.  (Ngo Aff., ¶ 3; Hayest Dep. 283.) Hayest worked in this job for less than one month.[34]  (Ngo Aff. ¶ 4.)

---

been billed, in breach of established procedures.  (Wellman Aff. at ¶ 6, Wellman Aff. Ex. 4.)
        June 16, 2005: Counseled for incorrectly filing paperwork in the wrong patient chart. (Wellman Aff. at ¶ 7.)

[31] The Affidavit of Tammy Wellman, Clerical Supervisor at CCF's Brunswick facility, October 9, 2006, Exhibit 3 to Defendant's Motion for Summary Judgment.

[32] Although Hayest disputes some of the charged scheduling improprieties, she admitted to others.  (*See* Hayest Dep. 266-67; Hayest Aff. ¶¶ 2,3,7 (*ECF No. 27*).)

[33] The Affidavit of Virginia C. Ngo, President of Expert System Applications, Inc., October 5, 2006, Exhibit 4 to Defendant's Motion for Summary Judgment.

[34] Hayest contends she left ESA voluntarily.  (Hayest Dep. 284-85; Hayest Aff. ¶ 6.)  The President of ESA, in her sworn affidavit, testifies Hayest was involuntarily terminated.  (Ngo Aff. ¶ 4.)

On February 20, 2006, Hayest again commenced employment, this time working the

phones for DialAmerica Marketing, Inc., of Berea, Ohio ("DAM").  (Hecker Aff. Ex. A, 4[35];

Hayest Dep. 285-287.)  This position only lasted until April 13, 2006.  (Hayest Dep. 253, 286;

Hecker Aff. Ex. A, 11.[36])

Then, on May 6, 2006, Hayest started work as a sales associate for Dillard's Department

Stores ("Dillard's").  (Hayest Dep. 254-55, 287.)  In her capacity as a sales associate in the

women's clothing department, Hayest worked the sales floor, and, in her words, was "on my feet

constantly."  (Hayest Dep. 84, 287-88.)  Dillard's discharged Hayest on June 16, 2006,[37] after

approximately one and a half months due to dishonesty and misuse of employee merchandise

discount codes.  (Jenko Aff. Ex. A, 2, 4-6[38]; Hayest Aff. ¶ 9.)

## IV. ANALYSIS

### A.    Hayest's Prima Facie Disability Discrimination Claim

As explained in Part II, to defeat CCF's summary judgment motion, Hayest must

demonstrate that a genuine issue of material fact exists as to her prima facie case of disability

---

[35] The Affidavit of Dorothy Hecker, custodian of employee and personnel records for DialAmerica Marketing, Inc., October 3, 2006, Exhibit 5 to Defendant's Motion for Summary Judgment.

[36] Hayest testifies she left this position voluntarily.  (Hayest Dep. 287.  *See also* Hayest Aff. ¶ 8.)  Her employment records, however, show Hayest was terminated under suspicion of improperly coding the computer system to show nonexistent sales.  (Hecker Aff. Ex. A, 9-11, 13.)

[37] Although she was fired on Friday, June 16, 2006, Hayest testified in her deposition on Tuesday, June 20, 2006 that she was still employed by Dillard's and had not been disciplined in any way.  (Hayest Dep. 287-88.)

[38] The Affidavit of Larry Jenko, custodian of employee and personnel records of The Higbee Company d/b/a/ Dillard's, October 9, 2006, Exhibit 6 to Defendant's Motion for Summary Judgment.

discrimination.  The critical consideration here is prong (1)[39]; there is no genuine issue of

material fact as to whether Hayest is "disabled" under the applicable statutory definitions.

Consequently, CCF prevails on its summary judgment motion.

>    **1.    Three ways to meet the definition of "disabled" under disability discrimination law**

Hayest must present evidence that she is disabled under one or more of the three possible

definitions of that term.  It is unclear from the complaint and subsequent documents filed with

the Court on which of the three "disability" definitional prongs Hayest relies.  Furthermore, it

appears from the complaint and subsequent documents that Hayest claims to be substantially

limited in the major life activity of working.[40]  After an individualized, fact-specific analysis of

---

[39] On prong (2) the Court notes that while some courts have considered an employee's excessive absenteeism evidence that particular employee was not qualified for an employment position, the Court does not reach that issue here, and assumes Hayest was so qualified.  As to prong (3), there is no dispute Hayest suffered an adverse employment decision; she was terminated.  Furthermore, as to prong (4), the Court finds Hayest did not have a disability for CCF to know about.  As to prong (5), the record does not indicate if Hayest was replaced or not, although common sense would dictate CCF would hire another person for the PSR position.

[40] Plaintiff's Complaint provides no further clarification of Hayest's claimed major life activities substantially limited by her alleged disabilities.  (*See ECF No.1*.)  Furthermore, Plaintiff's Opposition Brief discusses her alleged disabilities almost solely in reference to Hayest's work limitations.  (*See* Pl. Opp. Br. 7 ("Plaintiff could not maintain her employment with defendant with her medical conditions without relief (accommodation)"); ("Plaintiff suffers a major limitation on life activity of working . . . [and] being at work"); 8 (juxtaposing Hayest's hip replacement surgery, hip augmentation, stomach trouble and "emotional problems" with the effect thereof on her job attendance); 10 (citing the requirements for establishing a disability in conjunction with the duties of an employer to provide accommodations); (arguing that "an employee cannot simply ignore their [sic] disability for the first year of employment" and contending that allowing excused absences for "medical disability purposes" would not impose an undue hardship on CCF); 12 (arguing Hayest has a hip condition that led to surgeries and "impairment of Plaintiff's ability to perform" and that Hayest "has record of gastrointestinal problems and stress, which also hinder her performance at work") (emphasis added).)

>    Only in a single subsection heading does Hayest allege to suffer a limitation on life activities other than work.  (*See* Pl. Opp. Br. 7 ("Plaintiff suffers a major limitation on life activity of working, doing housework, being at work and activities that are affected by continuous pain, nausea, vomiting, diarrhea and depression incidental thereto").)  Hayest provides, however, nothing in the way of particulars to support her broad-brush argument in the brief.

Hayest's claims, the Court concludes Hayest's surgically repaired hip, her stomach issues, and her stress and anxiety do not qualify Hayest as disabled in this case.

### a. "Disabled" Category (A)

Hayest does not satisfy the requirements of category (A) of the definition of disabled; her hip, her stomach issues, and her stress and anxiety do not render Hayest unable to work in a "host of different jobs," and thus Hayest's impairments do not preclude her from a broad range of jobs.  Hayest is, therefore, not "disabled" under the first definitional prong of the term.

---

Hayest testified in her deposition that after her surgeries, she was temporarily unable to (1) go up and down stairs, (2) clean her house, (3) drive, and (4) bathe herself.  (Hayest Dep. 95-100.)  As frustrating as these limitations may be, each of these activities has been deemed not a major life activity for purposes of disability discrimination claims.  *See, e.g.*, *Marinelli v. City of Erie*, 216 F.3d 354, 362-63 (3rd Cir. 2000) ("doing housework" is not a major life activity); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2nd Cir. 1998 ("driving" and "doing housework other than basic chores" are not major life activities); *Chenoweth v. Hillsborough Cnty*, 250 F.3d 1328, 1329 (11th Cir. 2001) ("driving" is not a major life activity); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996) (stair climbing does not qualify as a major life activity); *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999) (walking up stairs is not a major life activity).

Notably, Hayest also testified that she was eventually able to go up and down stairs, clean, and drive, (Hayest Dep. 95-98, 100), and that she is able to get out of bed, brush her teeth, bathe herself, cook for her husband, and function as the primary caregiver for her children (Hayest Dep. 7,9,11).  Therefore, even absent any definitive, mandatory Sixth Circuit precedent as to whether these listed activities constitute a "major life activity," Hayest is not "disabled" as to these activities: she was only "substantially limited" as to these activities for a temporary period of time, rather than "permanently" or "long term" as required by the applicable case law.  *See Williams*, 534 U.S. at 198; *Dunaway v. Ford Motor Co.*, 134 Fed. Appx. 872, 877 (6th Cir. 2005) (citing *Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002); *Hein v. All America Plywood Co.*, 232 F.3d 482, 487 (6th Cir. 2000) ("Short-term temporary restrictions on major life activities are generally not disabilities under the ADA").

Further searching the record for any claim to disability as to a major life activity other than work, the Court notes Hayest testified in her deposition that she is still unable to engage in the following activities; (1) picking up her daughter, (2) bowling, (3) dancing, and (4) hiking.  (Hayest Dep. 95, 98-101.)  Various courts have concluded, however, that these activities also do not constitute "major life activities."  *See, e.g.*, *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 951 (7th Cir. 2000) (bowling is not a major life activity); *Weber*, 186 F.3d at 914 (hiking is not a major life activity); *Dose v. Buena Vista Univ.*, 229 F. Supp. 2d 910, 922 (N.D. Iowa 2002) (dancing is not a major life activity); *Jackson v. Univ. of Colorado Hospital Authority*, 1999 U.S. App. LEXIS 7796 (10th Cir. 1999) ("picking up children" is not a major life activity).

Therefore, the Court is left only with Hayest's singular claim to be substantially limited to the major life activity of working, and addresses that sole substantial limitation claim accordingly.

The Sixth Circuit has considered an employee's subsequent work history when assessing whether an employee was actually disabled for purposes of a disability discrimination claim. *See Bartkowiak v. Pillsbury Co.*, 1999 U.S. App. LEXIS 34067 (6th Cir. 1999). In *Bartkowiak*, the Sixth Circuit considered whether an employee with carpal tunnel syndrome was unlawfully discharged after repeatedly violating the employer's attendance policy. *Id*. at *2-6. The Sixth Circuit affirmed the district court's grant of summary judgment, finding first and foremost the employee had continued to work for the employer for some time after his carpal tunnel diagnosis and surgery, and therefore he was not disabled for purposes of disability discrimination law. *Id*. at *9.

While the Court is sympathetic to Hayest's undoubtedly painful hip problems, the undisputed evidence demonstrates her hip replacement and augmentation do not substantially limit Hayest in the major life activity of working. Nor do Hayest's alleged stomach issues and stress and anxiety rise to the level of impairments substantially limiting the major life activity of working.

### 1.      Hayest's work history at CCF

Hayest herself admits she was able to work in her PSR position at CCF despite her hip surgeries, stomach issues, and stress and anxiety. Thus, like the claimant in *Bartkowiak*, Hayest's work history at CCF negates her claims of disability, because it shows she was not precluded from her own job, much less a host of different jobs. Indeed, Hayest "pushed" and "begged" her doctor to release her back to work after the initial hip replacement. Also, during the limited periods after her two surgeries she worked answering phones, which is clearly part of her PSR job responsibilities. The undisputed evidence shows Hayest returned to the full range of

PSR duties relatively soon after her surgeries.  Specifically, Hayest requested to work in the check-out station because she was "getting tired" of working solely on the phones.  Moreover, she returned to work in a full body brace after the hip augmentation.  On neither occasion did Hayest feel the need to request job accommodations from CCF.  Essentially, no dispute exists that Hayest had hip surgeries on June 19, 2003 and in May, 2004, yet continued to work as a PSR at CCF until her discharge on June 16, 2005.

Additionally, Hayest presents no evidence that her stomach issues and stress and anxiety precluded her from her job at CCF; she testified that she was able to go to work for her shift normally despite her stomach issues, and that she required no accommodations for either her stomach issues or her stress and anxiety.  Deposition testimony also shows Hayest only sought medical treatment for her stress and anxiety for approximately a six-month period during 2004, well before her termination in June, 2005.  Even if there is a question about when, exactly, Hayest's various maladies reared their respective heads, there is no dispute that she continued to work at CCF for some time while she dealt with the "stomach issues" and "stress and anxiety."

### 2. Hayest's work history after discharge from CCF

Even assuming *arguendo* Hayest's work history at CCF is insufficient to show she is not precluded from a broad class of jobs, Hayest's post-CCF work history provides additional support for that conclusion.  Ample evidence demonstrates that the only substantial limitations on Hayest's employment are her own lack of professionalism and poor judgment, not anything related to her hip surgeries, stomach issues, or stress and anxiety.  Hayest later worked in several jobs requiring similar skills to her former PSR position, but had similar professional problems at each job.  The first two positions required skills Hayest used in her employment with CCF,

-24-

namely computer skills and telephone operating skills, while the Dillard's position was also a customer-service position requiring interpersonal skills analogous to Hayest's PSR job requirements. Hayest makes no claim of disability discrimination against any of the subsequent employers, nor does she present any evidence she required accommodations at these subsequent jobs. Critically for her disability claim, Hayest's job at Dillard's required her to be on her feet all day, a more physically demanding job requirement than anything from the PSR job.

Thus, the Court concludes Hayest's hip impairments did not preclude her from a class of jobs using similar skills to her CCF position, let alone a broad range of jobs available to her. Similarly, her "stomach issues" and "anxiety and stress" did not preclude Hayest from her PSR job or subsequent jobs. Consequently, the undisputed facts demonstrate Hayest is not disabled under the first definition of the term.

### b. "Disabled" Category (B)

Similarly, Hayest presents no evidence to support a conclusion that she has a record of being substantially limited in the major life activity of working. Simply showing a record of her medical maladies is not enough; Hayest must show a record of being precluded from jobs using her skills, or from a broad class of jobs available to her. Clearly Hayest was able to both work at CCF and procure subsequent, similar jobs, notwithstanding her impairments. Furthermore, for the record-of-impairment analysis, Hayest must actually have an impairment that precludes her from a broad class of jobs, which, as explained above, she cannot demonstrate. Accordingly, she fails to satisfy the second definition of "disabled."

### c.  "Disabled" category (C)

Finally, Hayest fails to show any evidence she was regarded as having a substantial limitation on the major life activity of working, the third category of the definition for "disabled."  Obviously for Hayest to argue under the first alternative (that CCF believed mistakenly believed Hayest had a substantially limiting physical or mental impairment when she had no such impairment) would be counterintuitive; she is claiming she <u>did</u> have a physical or mental impairment that substantially limited her in her job.

The only remaining question, then, is whether CCF mistakenly believed Hayest was substantially limited in her job when she was not so limited.  Again, however, Hayest cannot meet this burden; Hayest provides no evidence CCF believed she was precluded from her PSR job, or any job for that matter.  Instead, the record shows CCF treated Hayest no differently before the onset of her alleged impairments than after, with the exception of adjusting her work duties following the hip surgeries.  Although CCF made arrangements for Hayest to work the phones in the first several weeks following her two hip surgeries, the evidence also shows, again, that Hayest requested to essentially end that arrangement soon thereafter.

Furthermore, Hayest presents no evidence CCF took any actions based on Hayest's stomach problems other than to issue her attendance points as circumstances required pursuant to the Attendance Policy.  CCF's application of the uniformly applicable Attendance Policy is hardly sufficient evidence to create a genuine issue of material fact as to whether CCF believed Hayest was unable to do her job.  Consequently, Hayest fails to present any evidence CCF regarded her as precluded from her PSR job or a broad class of jobs, and thus she is not disabled under the third definition of that term.

Accordingly, Hayest fails to show evidence establishing a genuine issue of material fact on her disability discrimination claim, because Hayest cannot show she meets the threshold requirement of being disabled.  Therefore, CCF is appropriately entitled to summary judgment.

**B.      Burden-Shifting Analysis**

**1.      CCF's legitimate, non-discriminatory reasons for terminating Hayest**

In the alternative, even if there is a genuine issue of material fact as to whether Hayest is disabled and assuming without deciding that she could then show a prima facie case of disability discrimination, CCF's motion for summary judgment is still properly granted pursuant to a burden-shifting analysis.[41]  CCF provides a voluminous record of facts demonstrating CCF had myriad legitimate, non-discriminatory reasons to terminate Hayest.  Quite clearly, the record is replete with undisputed evidence showing Hayest's inability to abide by CCF's Code of Conduct and Attendance Policy.  Indeed, one might even conclude Hayest was fortunate to remain in CCF's employ as long as she did; the uncontested facts reveal Hayest had difficulty comporting with CCF's standards of professionalism and attendance almost from the outset of her employment.

CCF's employment policies explicitly describe the formal and informal disciplinary processes.  Hayest admits she was familiar with and understood the various CCF policies applicable here, and her deposition testimony demonstrated a remarkable familiarity with the details of these policies.  She knew the Rules of Conduct prohibit unprofessional behavior and profane or unprofessional language, and that she was to follow established CCF practices and

---

[41] Similarly, even if the Court were to apply the more lenient *Johnson* interpretation of Ohio's statutory definition of "disabled" and therefore potentially consider Hayest's prima facie § 4112 claim, Hayest still can not overcome the burden shifting analysis step discussed in this section.

procedures, which include how and when employees may leave their workstations, yet she violated these policies.  Similarly, she knew CCF had a no-fault attendance policy, that she would accrue attendance points for her various absences and tardies regardless of the reasons for those breaches, and that termination was a potential repercussion of her inability to conform to her job's attendance expectations.

Hayest does not contest the fact that in little more than two years, she went from new hire to terminated employee, stopping at all four official steps of the established Progressive Corrective Action policy (one of those steps twice), and compiling fifteen Anecdotals along the way.  Even if the Anecdotals are not officially considered in the Progressive Corrective Action policy, they provide ample evidentiary proof of Hayest's poor performance record as a CCF employee.  Simply put, the documented problems with Hayest's unprofessional job performance are indisputably sufficient to carry CCF's burden of production.

### 2.    Hayest bears the burden to show pretext

Because CCF proffers legitimate, non-discriminatory reasons for terminating Hayest, Hayest must present sufficient evidence from which a trier of fact may reasonably reject CCF's explanation.  The Court is unclear about what, exactly, Hayest's pretext argument is, but it must fail nonetheless.

CCF extensively documented Hayest's absenteeism and work performance problems, and on those grounds CCF terminated Hayest.  In response to the absenteeism/attendance policy violations, Hayest simply offers conclusory statements and unsubstantiated allegations that CCF's no-fault attendance policy is "illegal" under the ADA, that CCF "does not like employees who miss time from work even when its [sic] for medical reasons," (Hayest Opp. Br. 8), and that

-28-

CCF would "trump up charges against plaintiff to get rid of her for absenteeism," (id.).  Hayest offers no case law authority or substantive evidence, however, to support these statements.  Essentially, Hayest attacks the alleged unfairness or illegality of the policy, not the fact that she violated the policy repeatedly or that she was fired because of it.[42]

Similarly, as to CCF's performance-related discharge reasons, Hayest offers a) simple denials that she engaged in the behavior, and b) speculative postulations with no basis in fact, seeking to excuse her participation in the very scheduling abuses in which she denied participating.  Neither is sufficient to satisfy Hayest's "pretext" burden.  In fact, Hayest's own testimony and sworn affidavit bolster CCF's proffered performance-based reasons for firing Hayest, which focus on her inappropriate manipulation of the scheduling system.  Critically, Hayest fails to offer any affidavits or deposition testimony from any doctors, nurses, PSRs, or other employees at CCF that might support her own claims, denials, and outright admissions.[43]

---

[42] By arguing that no-fault attendance policies are illegal under disability discrimination laws, Hayest selectively ignores established Sixth Circuit case law almost directly on point.  *See Gantt v. Wilson Sporting Goods*, 143 F.3d 1042, 1045-46 (6th Cir. 1998).  Concluding the employer's no-fault leave policy was legal under the ADA, the *Gantt* court stressed that the leave policy in question did not distinguish between disabled and nondisabled persons, and that the claimant presented no evidence the policy was applied unfairly or inconsistently enforced.  *Id.*

Like the employer's leave policy in *Gantt*, CCF's attendance policy does not distinguish between disabled and nondisabled persons.  (*See* Cherry Aff. Ex. 2.)  Similarly, although Hayest made allegations that other PSRs were treated differently and allowed more leeway regarding policies and procedures governing lunch breaks, she admits she has no personal knowledge of others who did not receive points when appropriate, and she submits no substantive evidence that would prove her claims.  (*See* Hayest Dep. 40-42.)

[43] In her deposition, Hayest admitted that she was "not the only one" inappropriately holding appointment times at the end of the day only to cancel the appointment and leave work early.  (Hayest Dep. 266-67.  *See also*, Hayest Aff. ¶ 2.)  She also admitted she had called patients and asked the patients to come in earlier than their designated appointment time.  (Hayest Dep. 266-67.  *See also*, Hayest Aff. ¶ 7.)  These behaviors occurred while Hayest was already on notice via the PIP.  Hayest essentially argues her actions were pursuant to direction from others and therefore not violations of CCF policies, not that she did not engage in the actions.  The proper forum for this argument, however, was the CCF Right of Review procedure, not this Court.

Instead, she merely offers justifications based on unnamed doctors' and nurses' directions (Hayest Aff. ¶¶ 2, 7), as well as arguments that "in the [CCF] culture it is hardly likely that a person of plaintiff's status would block out times to suit herself," and "it is also highly unlikely that someone of greater status would admit giving plaintiff instructions to do so," (*id*.). "Hardly likely" and "highly unlikely" are a far cry from meeting Hayest's evidentiary burden here. Hayest must present sufficient evidence from which a reasonable jury could reject CCF's position that Hayest was terminated based on her inappropriate scheduling system manipulation, unprofessional behavior, and attendance policy violations. She fails.

Accordingly, Hayest has not sufficiently rebutted CCF's proffered legitimate, non-discriminatory reasons for terminating her, and thus she cannot show pretext as required to defeat CCF's summary judgment motion.

## V. CONCLUSION

Hayest cannot establish an essential element of her prima facie disability discrimination case, as the evidence shows she was not disabled during her employment, whether with CCF or after. Accordingly, Hayest cannot defeat CCF's motion for summary judgment on Hayest's disability discrimination claim.

In the alternative, CCF offers more than sufficient evidence to show legitimate, non-discriminatory reasons for terminating Hayest, which Hayest fails to rebut with sufficient evidence of pretext. Thus, even if Hayest could satisfy her prima facie claim, Hayest cannot defeat CCF's motion for summary judgment.

Accordingly, CCF's Motion for Summary Judgment, (**ECF No. 16**) is **GRANTED**.


**IT IS SO ORDERED.**




*/s/ Dan Aaron Polster   10/19/06*
**Dan Aaron Polster**
**United States District Judge**